IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 9, 2021 Session

## STATE OF TENNESSEE v. LEAVY L. JOHNSON

**Appeal from the Criminal Court for Davidson County**
No. 2017-A-116     Monte Watkins, Judge
_____

### No. M2020-01443-CCA-R3-CD
_____

Following a bench trial, Defendant, Leavy L. Johnson, was convicted of rape, and the trial court sentenced him to eight years in confinement. On appeal, Defendant argues that the trial court committed plain error by admitting hearsay, that the evidence at trial was insufficient to support his conviction, and that the trial court erred by ordering him to serve his sentence in confinement. After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Manuel B. Russ (on appeal), Nashville, Tennessee, and Sean McKinney (at trial), Nashville, Tennessee, for the appellant, Leavy L. Johnson.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Roger Moore and Ross Boudreaux, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural History

This case arises from the rape of the victim when she and two friends attended a concert at Bridgestone Arena ("Bridgestone") in Nashville. The victim and one of her friends stopped Defendant, a Bridgestone employee, and asked him if he could assist them in getting better seats at the concert. Defendant requested payment in the amount of $500,

and when the victim's friend went to the ATM, Defendant lured the victim behind a curtain and raped her.

*Trial*

McKenzie Overstreet testified that she and the victim were friends and went to a concert together on August 14, 2016, at Bridgestone. Ms. Overstreet said that she, the victim, and the victim's friend, Laura Perry, took an Uber to Bridgestone for the concert. She recalled that, when they arrived, they found their seats, and then she and the victim went to the restroom. Ms. Overstreet explained that she and the victim found a Bridgestone employee, Defendant, near the restroom and asked him if they could get better seats because it was Ms. Overstreet's birthday. Ms. Overstreet said that Defendant first declined but then said, "Well let me go ask." When Defendant returned, he said that he could get closer seats for them if they "tipped" him $500.

Ms. Overstreet left the victim with Defendant and went around the arena to an ATM to get cash for Defendant. When Ms. Overstreet returned to the victim's last known location "five or ten minutes" later, the victim and Defendant were gone. Ms. Overstreet testified that she began searching for the victim and calling and texting her. About fifteen to twenty-five minutes later, Ms. Overstreet finally found the victim near the vendors and asked the victim where she had been. Ms. Overstreet recalled,

> [I]t wasn't until she looked up at me, I mean, just tears rolling down her face. I quickly approached her and asked her what was wrong, and she told me she had been sexually assaulted, and I quickly grabbed the nearest officer that I could find, who was not too far behind me, and I told him what had happened and they handled it from there.

Ms. Overstreet explained that she and the victim went with the officers to answer some questions and that she and the victim were then transported to the hospital for the victim to have a "rape kit." She said that the victim was crying "a lot" and "was just beside herself."

On cross-examination, Ms. Overstreet stated that she, Ms. Perry, and the victim had one glass of wine before they left for the concert. She recalled that, when they arrived at Bridgestone, the victim had "a couple of beers." Ms. Overstreet stated that, when Defendant initially refused their request, either she or the victim said, "Hey, it's [Ms. Overstreet's] birthday, is there any way we can get closer or backstage? [Ms. Overstreet] named her dog after [the performer]." Ms. Overstreet denied that the victim was affectionate with or "hugging on" Defendant.

The victim testified that, prior to August 14, 2016, she did not know Defendant. She said that she flew in from Evansville, Indiana, that day to attend a concert with her friends. She recalled that, while she was at Ms. Perry's house waiting for Ms. Overstreet to arrive, she had a "Corona" and some snacks. The victim explained that, once they arrived at Bridgestone for the concert, she purchased two beers and drank one of them. She said that, after the opening acts, there was an intermission before the main performer began, so she and Ms. Overstreet went to the restroom. She recalled that Ms. Overstreet wanted to meet the performer, so they stopped the first Bridgestone employee they found, Defendant, to ask about going backstage. The victim said that she knew Defendant was a Bridgestone employee because of his uniform. Defendant told the victim and Ms. Overstreet that he might be able to get them into an "after party" and that he told them to wait while he asked. When Defendant returned, he told the victim and Ms. Overstreet that he could get them backstage for $500.

The victim explained that, when Ms. Overstreet went to the ATM to get $500, the victim waited with Defendant because Ms. Overstreet did not want them to get separated from Defendant. The victim then explained,

> [T]hen I don't remember anything but walking towards another black curtain, him saying like "This is . . . where you're gonna meet [the performer], . . . your friend is behind us." And then after, I remember opening the black curtain and then once we went in, I remember feeling somebody just like pushing me towards the ground. I hit my elbow on something, I'm assuming the seats or the floor, and then I remember just kind of going in and out of consciousness and just feeling like a force on my left leg and being held down on my wrists, and then I remember I could kind of hear the music, like [the performer] was on stage, so I could hear him, he was performing already. And then the next thing I remember being pulled up and him yelling, telling me to get up, and I was crying at that point, and he kept saying, you know, "I'm sorry, I'm sorry, be quiet." And as he was – I started screaming "What did you do to me? What did you do to me," because at this point my underwear and my pants were around my ankles, and he took off and ran out the black curtain to the right-hand side of that section, so he went right. And I waited, pulled up my undergarments and my pants and waited there for a second just because I didn't know if he was still outside behind that black curtain.

The victim explained that it was "pretty dark" behind the curtain but that no one else was there besides Defendant and her. She said that, when Defendant held her down, he used his right hand and right leg. The victim said Defendant took her pants and underwear off while he held her down. She stated that Defendant put his penis inside her vagina and

that he did not use a condom. The victim recalled trying to "grab at him" and telling him to "stop." The victim said that there was not "any doubt in [her] mind" that what Defendant did to her was "without [her] consent" and that Defendant inserted his penis into her vagina "by force."

The victim explained that, after the assault, she felt pain in her abdomen, head, and elbow, and that she started walking around "kind of out of it." She saw the vendor tables, so she approached them to get assistance. Ms. Overstreet then found her near the vendors. She said that Ms. Overstreet pulled someone over and asked for assistance.

The victim recalled that she met with Evansville Police Department Detective Kyle Thiry on August 14, 2016, and that he showed her a photographic lineup. The victim said that she pointed out Defendant in the lineup and that both his hairline and his "droopy" eyes made him distinctive to her. She said that she was "98, 95 percent" certain of her lineup identification. The victim said that she was shown a second photographic lineup on October 7, 2016, and that she again selected Defendant.

On cross-examination, the victim agreed that Defendant had no way of knowing that she had had two alcoholic beverages that evening. She denied flirting with Defendant prior to the assault. The victim explained that, when she and Defendant went behind the curtain, she "remembered his hand on [her] back" before she fell to the ground. The victim said that Defendant held her with one hand and removed her jeans with his other hand. She did not recall whether her clothes were ripped or whether anyone inspected her clothes at the hospital or police station. She said that, when she told Defendant, "stop," he did not stop "at that point."

The victim said that she did not have anything to drink after the assault and that she arrived at the hospital one or two hours after the assault. She said it surprised her that her blood alcohol concentration at the hospital was .16.

On redirect examination, the victim stated that she did not recall whether Defendant held her with more than one hand during the assault. She explained, "[T]hat's all I remember is just that one hand, but I don't know if he used others, like I said, I was in and out of consciousness." She agreed that, when she first arrived at Bridgestone, she did not "feel right" and that her feelings were consistent with being under the influence of alcohol.

Dennis Cisneros testified that, in August 2016, he worked as an alcohol compliance officer at Bridgestone. He said that, on the night of August 14, 2016, he saw the victim come out from behind a curtain where she was not supposed to be. Mr. Cisneros said that she looked "a little frizzy" and "like she had been drinking" because she stumbled some to the right and the left. He recalled that, within fifteen to twenty seconds, he saw Defendant

come out from behind the same curtain. Mr. Cisneros said that he and Defendant made eye contact and that Defendant "took off" through a side door to the parking garage. He recalled that Defendant was wearing a Bridgestone uniform but that he was wearing a red undershirt instead of the required black undershirt. Mr. Cisneros explained that Defendant's uniform shirt was "untucked" and that he looked "frazzled[.]" Mr. Cisneros then saw the woman speaking to police officers.

Mr. Cisneros stated that, a few days later, he was approached by police to see if he had noticed anything unusual that night. When Mr. Cisneros explained to the officers what he saw, they showed him a photographic lineup, and he selected Defendant as the Bridgestone employee who came from behind the black curtain. He said that he had never seen Defendant before August 14, 2016.

On cross-examination, Mr. Cisneros said that because the victim was walking toward police officers, he "figured the cops would handle whatever the problem was."

Former Goodlettsville Police Department Detective Miranda Vaughn testified that, on August 14, 2016, she was working security at Bridgestone. Detective Vaughn said that she received a call from Bridgestone's dispatch that a woman had been sexually assaulted, so she responded and made contact with the victim. She recalled that the victim was upset and crying and that she told Detective Vaughn that someone raped her. Detective Vaughn said that the victim was not "heavily intoxicated," that her speech was not slurred, and that her balance "seemed to be fine." Detective Vaughn informed her superior officer, Officer Grant Carroll, of the incident and then took the victim to a first aid room so she could speak with medical staff privately. Detective Vaughn recalled:

> She told me that she was approached by a male subject that told her that she could -- he could get her down to see [the performer], led her off to the dark area behind the stage set-up. And then I think [I] remember her telling me that she tripped over some steps, and at that point he had grabbed her and held her down, all force, pulling her pants and her panties down and then penetrated her vaginally with his penis.

The victim gave Detective Vaughn a description of the suspect as a "white male,"[1] and other officers searched for the suspect while she stayed with the victim.

Metropolitan Nashville Police Department ("MNPD") Officer Grant Carroll testified that he was the "incident commander" at Bridgestone on August 14, 2016, and that he received a report of a sexual assault. When he encountered the victim, she "seemed

---

[1] Based upon the exhibits in the record, it appears to this court that Defendant is a Black male.

visibly upset. She seemed shaken." Officer Carroll escorted the victim and Ms. Overstreet to a first aid room. He said that, as they passed section 111 of the arena, "she grasped my arm firmly, it wasn't an aggressive grab, and she indicated to me that 111, 112 was similar to the area where she said she had been raped."

On cross-examination, Officer Carroll stated that breathalyzer tests were never performed at Bridgestone. He said that the victim "did not appear to [him] to be intoxicated."

MNPD Detective Carlos Urritia testified that he responded to the hospital to investigate a rape that occurred at Bridgestone on August 14, 2016. He recalled that the victim's eyes were "red and puffy" as if she had been crying and that she did not seem too intoxicated to consent to sexual contact. Detective Urritia explained:

> She had advised me that she had been at the concert with a friend of hers and she had made contact with [D]efendant, and he had escorted her to, from what I understand, to go backstage, and as they turned the corner, she doesn't remember if she tripped or fell or if she was pushed, but she ended up on the ground, and [D]efendant got on top of her, pulled her panties down and proceeded to have sex with her. Afterwards, they got up and they walked back out of the hallway and they went their separate ways, she encountered officers in which she asked for assistance.

Detective Urritia recalled that the victim said she tried to stop Defendant and that Defendant "said that he was sorry, that he didn't mean to hurt her." Detective Urritia recalled that the victim described the suspect as "male Black, wearing a yellow [p]olo, black shorts." She told Detective Urritia that the rape "lasted about [ten] minutes." The victim told him that she did not know if Defendant used a condom or if he ejaculated.

Detective Urritia testified that he learned the following day that a Bridgestone worker, Mr. Cisneros, could identify the suspect. He explained that Mr. Cisneros went through photographs of Bridgestone employees and identified Defendant as the person who came from behind the black curtain the night before. Detective Urritia found a photograph of Defendant from a previous arrest and used it to create a photographic lineup for the victim. Because the victim had already returned to Evansville, Indiana, he sent the photographic lineup to Evansville Police Department Detective Kyle Thiry to conduct the lineup. When Detective Urritia received the lineup back from Detective Thiry via email,[2] the lineup indicated that the victim had selected Defendant as the perpetrator.

---

[2] Detective Urritia testified that the hard copy of the lineup and all accompanying paperwork was lost in the mail.

- 6 -

Detective Thiry testified that he conducted two photographic lineups with the victim – one in August 2016 and one in October 2016. He said that the victim selected Defendant in both lineups and that, after the second lineup, the victim was "crying pretty heavily." The video recordings of both lineups were played for the trial court.

On cross-examination, Detective Thiry agreed that, on the video of the second lineup, the victim stated, "I was in and out; I was intoxicated."

Pamela Crues testified as an expert in medical legal examination that she worked at Nashville General Hospital as an emergency room provider and as the Medical Legal Exam Team Manager. She said that she did not examine the victim after the incident but that the nurse who did was no longer available. Ms. Crues reviewed the victim's medical legal exam report. She explained that, although the report indicated that the victim had no physical trauma, a lack of trauma was not inconsistent with a rape victim. She explained, "most sexual assault victims do not have any trauma, and that's pretty standard. I've personally done around 700 sexual assault exams, and maybe only about five to ten percent of victims ever have trauma in the vaginal area." Ms. Crues continued, "[W]omen do have babies, and so the vagina is very accommodating. So, if you think about the vagina can expand enough to let an infant's head and shoulders come through, a penis, I mean, it might cause some trauma, but most of the time it doesn't." She testified that, as part of the examination, the victim had several swabs taken, as well as urine and blood tests for pregnancy, blood alcohol level, and disease. Ms. Crues noted that the victim said "that there was only vaginal penetration" and that Defendant tried to kiss her on the mouth and neck.

On cross-examination, Ms. Crues agreed that the absence of physical trauma did not "indicate anything one way or another." She agreed that the physical examination only established that sexual contact had occurred and not whether it was consensual.

On redirect examination, Ms. Crues agreed that the victim's statements memorialized in the report described a "non-consensual sexual act."

MNPD Officer Kelcey Bell testified that he transferred the victim from Bridgestone to the hospital on August 14, 2016. He recalled that the victim "appeared to be visibly upset, puffy eyes, heard some sniffling, it appeared that she had been crying."

Defendant testified that he managed concession stands at Bridgestone in August 2016. He said that, on August 14, 2016, the victim and Ms. Overstreet approached him, told him that it was Ms. Overstreet's birthday, and asked to go backstage. He stated that he told the women that he would not be able to get them backstage but that they persisted, telling him he was "someone of importance" and that they would "do anything." Defendant

said that Ms. Overstreet offered to give him $500 and that the victim was "caressing [his] arm and [his] shoulder while [he was] standing there." Defendant recalled, "[A]t that point, like I said[,] 'I can get you close maybe.'" Defendant said that he did not have the authority to get anyone backstage to meet the performer but that he might have been able to get them closer seats "behind the stage." Defendant continued, "But [Ms. Overstreet] was like 'We'll give you $500,' and then she looked at [the victim] and said, 'Would you -- would you f*ck him[?]'"

Defendant testified that the victim started "kissing on [his] neck" and gave Defendant her phone number. He said that he went down near the stage to look for the "person [he] knew" who would let the women sit closer to the stage. The person he knew was there, so Defendant returned to the victim and Ms. Overstreet. Defendant said that he asked Ms. Overstreet to get the $500, and Ms. Overstreet asked the victim, "Are you going to have sex with him?"

Defendant said that Ms. Overstreet went to the ATM, and the victim started kissing Defendant and "grabbed [him]" in his "private area." He recalled, "[the victim] said 'Do you want to be over on this side? Do you want to be right here?'" Defendant said that he responded by taking her to a curtained area. He explained, "I knew what she was talking about because her friend obviously said, 'Are you gonna f*ck him,' so when she said that, I knew what she was talking about. . . . I knew she wanted, basically she wanted to have sex." Defendant stated that the victim did "not at all" seem inebriated.

Defendant said that, once they were behind the curtained area, the victim put her hand down his pants and took his hand and put it down her pants. He said that they sat on the steps and that the victim unbuttoned and unzipped his pants. Defendant stated that the victim took one leg out of her pants. He said that he "had sex" with the victim for "three or four minutes" and that she never cried, kicked, scratched, or asked him to stop. Defendant stated that he had seven daughters and that he would "never take someone's innocence." Defendant said that the victim never lost consciousness.

Defendant said that, after they finished "having sex," they got dressed and that he told the victim he would try to get them close to the stage. He stated that the victim was upset because she expected to go backstage to meet the performer. He said, "When we walk[ed] back from behind the curtains, I said, 'Well, hey, if you go to the left, I will meet y'all back where I met you at.'" Defendant said that he finished checking on his concession stands and then checked to see if he could still get them close to the stage. He stated that he could not find the two women, so he called the victim's phone. Defendant said that the victim never answered her phone, so he finished his shift and went home about 10:30.

Defendant said that he was arrested a few days later on a warrant for driving without a license. He said that he was in custody for about two weeks. Defendant stated that, after being released from custody, he called Bridgestone to check in and that they fired him for missing two shifts. He said that no one at Bridgestone mentioned anything about an alleged rape. Defendant said that, shortly thereafter, he appeared in court on another charge that was dismissed and that, in September 2016, he moved to Florida for a new job and to be near his two sons.

On cross-examination, Defendant agreed that he had a "bail jumping" conviction from Georgia in 2014. He said that he also received a 2017 conviction for a 2014 theft in Texas.

Defendant said that, when he left with the victim to "have sex" with her, he was still on shift at work and could have gotten in trouble. Defendant stated that the area where the incident occurred was near a concession stand and that "if she would have been yelling, like she said, they would have heard her in the stand because the concert wasn't going on, it was a[n] intermission." Defendant denied that he promised to get the women backstage in exchange for sex. He said that he only promised to get them closer to the stage in exchange for $500.

In rebuttal, the State recalled Ms. Overstreet. Ms. Overstreet denied that, prior to going to the ATM machine, she asked the victim, "Would you f*ck him?"

The trial court stated that it "considered all the testimony in this matter and thought it through carefully[.]" The court found Defendant guilty of rape.

*Sentencing Hearing*

At the sentencing hearing, the State admitted Defendant's presentence report and psychosexual evaluation. Defense counsel and the prosecutor agreed that Defendant was a Range I standard offender.

The victim read her victim impact statement, explaining that the rape gave her "nightmares," "sheer terror, [] sleeplessness, [] paranoia and panic attacks." She recalled that, following the rape, she was "put through a rape kit while staring at the mirror not recognizing the damaged person that stood before [her]." The victim stated that she used to love being around people and that she lived her life without fear but that now, "[t]hat person has vanished." The victim explained, "Not only did he force his way into my body, but he forced his way into my life forever. For people to truly know me, they now must know him. And how fair is that." She stated that the attack caused her to miss work and "spend thousands of dollars on therapy." The victim asked "the criminal justice system to

do what it is intended to do and keep him from destroying someone else's life." She asked the court to impose a sentence of confinement.

Ms. Overstreet read her statement to the court. It read in part:

In the following weeks, months and years [after the rape], I witnessed [the victim] struggle in unfathomable ways. She would have anxiety and panic attacks often and not just in public places like at the mall, but in her safe places like home and work. Overnight, I witnessed my bubbly, charismatic, outgoing friend become debilitated. And it was heartbreaking.

Ms. Overstreet asked the court to impose a sentence of confinement.

Defendant submitted letters of support from his pastor, two employers, and a family member.

Ms. Bertha Johnson, Defendant's mother, testified that Defendant was a "loveable guy" and that he was "very helpful" and actively involved with his nine children, his nieces and nephews, and his church. She said that Defendant helped her financially because she was disabled. Ms. Johnson explained that Defendant had been continuously employed, as an adult. She asked the court to impose a sentence of probation.

Mrs. Sheree Johnson, Defendant's wife, testified that Defendant's children would come to their home and spend time with Defendant. She said that their home was a "safe environment" with no drugs or firearms. Mrs. Johnson agreed that she would help Defendant comply with any probation requirements or sex offender registry requirements. She stated that she knew her husband's character and that he would not "go out and harm someone like that." Mrs. Johnson testified that, since Defendant had been incarcerated, she was "about to lose everything" and had "fallen drastically behind" because he was not there to help her.

Defendant's daughter, A.J.,[3] testified that she lived with her mother and that her mother and Defendant "got along." She said that her relationship with Defendant was "good" and that Defendant had always been in her life and that he was "the fun parent." A.J. was surprised by the charges against Defendant and did not believe them because she "kn[e]w [her] daddy." She stated that Defendant's conviction did not change her feelings about him and that she still wanted to spend time with him. A.J. asked the court to place Defendant on probation so that Defendant could see her graduate from high school.

---

[3] It is the custom of this court to refer to minors by initials only.

Following argument, the trial court stated:

I have taken into consideration both sides, his family as well as the victim, her friends and family. And I know how much it affects both sides when something like this occurs. And so the [c]ourt weighs those things in considering what kind of sentence is necessary for an event such as this, a crime such as this. And so the [c]ourt does believe that 40-35-103 is appropriate, and that is that confinement is necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrence to others who may engage in similar conduct.

I've looked at the enhancement factors as the [c]ourt sees them as well as the mitigating factors. And the mitigating factors in this particular case go more toward his family, what part he has played there. So the [c]ourt has weighed both of those. And the [c]ourt believes that the appropriate sentence in this case is eight years in the penitentiary. He will be on the sex offender registry and supervision for life.

Defendant filed a motion for new trial, which the trial court denied. Defendant now timely appeals.

## Analysis

### *I. Hearsay*

Defendant argues that the trial court committed plain error by admitting hearsay. He acknowledges that trial counsel did not object to multiple witnesses who testified to the victim's out-of-court statements and that, at other times, trial counsel elicited hearsay statements. Defendant asserts that the State elicited hearsay statements from Ms. Overstreet and that trial counsel then "reiterated the substance of [Ms. Overstreet's] hearsay" during cross-examination. Defendant contends that the State also elicited similar hearsay statements from Detective Vaughn, Officer Carroll, and Ms. Crues, that both the State and trial counsel elicited hearsay from Detective Urritia.

The State argues that, because Defendant does not explain exactly which statements he considers to be hearsay, the hearsay issue is "procedurally defaulted." The State acknowledges that Defendant cites to pages in the transcript but argues that these pages span several statements made by each witness. The State contends that the hearsay issue is "waived" and that Defendant has not shown plain error because no clear and unequivocal rule of law was breached. The State argues that the alleged hearsay statements admitted at trial were either exceptions to hearsay exclusion, including "excited utterances, statements

- 11 -

of then existing emotional or physical condition, statements for purposes of medical diagnosis and treatment, or records of regularly conducted activity[,]" or were non-hearsay. Further, the State argues that the testimonies concerning the victim's out-of-court statements did not impermissibly bolster the victim with prior consistent statements but rather, showed that the victim's story remained consistent and "rehabilitate[d] the [victim's] credibility." Moreover, the State avers that trial counsel cannot show that he did not object for tactical reasons since the defense strategy was to attack the victim's credibility. Finally, the State argues that no substantial right of Defendant was violated.

Under the Tennessee Rules of Evidence, "hearsay" is any statement, other than one made by the declarant while testifying at trial or in a hearing, offered into evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements are not admissible unless they fall within one of the evidentiary exceptions or some other law renders them admissible. Tenn. R. Evid. 802. "Prior statements of witnesses, whether consistent or inconsistent with their trial testimony, constitute hearsay evidence if offered for the truth of the matter asserted therein." *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980).

Defendant concedes that this issue is waived because trial counsel did not lodge an objection at trial to any alleged hearsay statement. Tenn. R. App. P. 36(a); *State v. Davis*, 751 S.W.2d 167, 171 (Tenn. Crim. App. 1988). Moreover, based on Defendant's citations to the transcript, it is apparent that the alleged hearsay statements of which Defendant complains are the victim's out-of-court statements regarding the details of the assault to Ms. Overstreet, Detective Vaughn, Officer Carroll, Detective Urritia, and Ms. Crues. We will review these statements under plain error. Tenn. R. App. P. 36(a), (b).

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

We agree with the State that Defendant has not established plain error. Defendant cannot show that he did not waive the hearsay issue for tactical reasons. *Adkisson*, 899 S.W.2d at 640-41. As Defendant stated in his brief, trial counsel did not object to any alleged hearsay statement, and trial counsel elicited testimony regarding the substance of the victim's prior statements from Ms. Overstreet and Detective Urritia. Because credibility was the only issue at trial, it is clear that trial counsel tried to discredit the victim by going through her prior statements in detail in an effort to find an inconsistency. Indeed, trial counsel's closing argument was heavily focused on inconsistencies among the testimonies of the victim and the other witnesses. We conclude that trial counsel's failure to object to alleged hearsay statements was a tactical decision. "The plain error rule 'should not be used to provide a second bite at the apple for a defendant whose deliberate trial strategy failed.'" *State v. Walker*, 910 S.W.2d 381, 400 (Tenn. 1995), Drowota and Birch, JJ., concurring (quoting *United States v. Valencia-Lucena,* 925 F.2d 506, 514 (1st Cir. 1991)). Defendant is not entitled to plain error relief.

## II. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his conviction for rape. He contends that his testimony provided reasonable doubt to the extent that no reasonable trier of fact could convict on all the elements of the offense. The State responds that the evidence was sufficient to support the verdict. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As pertinent here, rape is "unlawful sexual penetration of a victim by the defendant" where "[f]orce or coercion is used to accomplish the act[.]" Tenn. Code Ann. § 39-13-503(a)(1) (2016). "Sexual penetration" means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7) (2016).

There was sufficient evidence to support Defendant's conviction for rape. Defendant admits that he sexually penetrated the victim, so the only issue for the trial court to decide was whether "force or coercion was used to accomplish the act." Tenn. Code Ann. § 39-13-503(a)(1) (2016). The victim testified that Defendant led her behind a curtain under the pretense that she would meet the performer there. Once behind the curtain, the victim fell, and Defendant held her down with his arm and leg while he removed her clothing. The victim recalled trying to "grab at him" and telling him to "stop." This evidence was sufficient to show that the sexual intercourse was without the victim's consent and was performed through force.

Moreover, the victim's appearance and demeanor immediately following the assault supported the trial court's conclusion that the victim was forcibly raped. She immediately told Ms. Overstreet and police officers what had happened, and they each testified that she was upset and crying. Detective Urritia and Officer Bell also testified that the victim had red, puffy eyes and that she was visibly upset. Taken in the light most favorable to the State, the evidence is sufficient for a rational trier of fact to find Defendant guilty of rape.

### III. Denial of Probation

Defendant argues that the trial court erred by imposing a sentence of confinement. He contends that his psychosexual evaluation showed that he was at a low to moderate risk to reoffend and that the trial court failed to take the psychosexual evaluation into consideration. He asserts that he served "between sixteen and eighteen months" in confinement prior to trial and has been incarcerated since trial; thus, the time he has already served should "assuage[] any questions by this [c]ourt that a sentence of release into the community might depreciate the seriousness of the offense or the punishment for it."

The State responds that the trial court did not abuse its discretion in imposing a sentence of confinement.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of

discretion standard with a presumption of reasonableness.  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).

In determining the proper sentence, the trial court must consider:  (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing.  *See* Tenn. Code Ann. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen.  Tenn. Code Ann. § 40-35-210(e) (2020); *Bise*, 380 S.W.3d at 706.  However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]."  *Bise*, 380 S.W.3d at 705-06.  The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper.  Tenn. Code Ann. § 40-35-401 (2020), Sentencing Comm'n Cmts.

The abuse of discretion with a presumption of reasonableness standard of review set by our supreme court in *Bise* also applies to a trial court's decision to grant or deny probation.  *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (citing *Bise*, 380 S.W. 3d at 708).  Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing.  *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)).  Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary."  Tenn. Code Ann. § 40-35-102(6).

Tennessee Code Annotated section 40-35-303 states that

[a] defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less; however, no defendant shall be eligible for probation under this chapter if convicted of a violation of § 39-13-304, § 39-13-402, § 39-13-504, § 39-13-532, § 39-15-402, § 39-17-417(b) or (i), § 39-17-1003, § 39-17-1004 or § 39-17-1005.  A defendant shall also be eligible for probation pursuant to § 40-36-106(e)(3).

- 15 -

Tenn. Code Ann. § 40-35-303(a) (2020). A defendant has the burden of establishing that he is suitable for probation and "demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *Carter*, 254 S.W.3d at 347 (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

Under Tennessee Code Annotated section 40-35-103, the trial court should look to the following considerations to determine whether a sentence of confinement is appropriate:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1) (2020). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2020).

Here, Defendant was convicted as a Class I standard offender of rape, a Class B felony, which has a sentencing range of eight to twelve years. Tenn. Code Ann. § 39-13-503(b) (2016); § 40-35-112(a)(2) (2020). The trial court sentenced Defendant to eight years, and Defendant does not challenge the length of his sentence on appeal.

## A. Applicable Standard of Review

Defendant argues that this court should review his denial of probation *de novo* with no presumption of correctness because the trial court failed to make sufficient findings on the record.

The State responds that this court should review the trial court's decision to deny probation under an abuse of discretion standard. It states, "Although the trial court's ruling was meager, it indicated that it had considered the purposes and principles of the Sentencing Act, the evidence in the record, and any potential enhancement and mitigating factors."

- 16 -

"[T]he key to meaningful appellate review under the abuse of discretion standard is whether the trial court recites a proper basis for the sentence." *Caudle*, 388 S.W.3d at 279. "[S]entences should be upheld *so long as* the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." *Bise*, 380 S.W.3d at 706 (emphasis added). "When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, the defendant's present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public." *State v. Tammy Marie Harbison*, No. M2015-01059-CCA-R3-CD, 2016 WL 613907, at *3 (Tenn. Crim. App. Feb. 12, 2016), *no perm. app. filed*. A reviewing court should perform a *de novo* review when the trial court fails to articulate the specific facts upon which it bases its determination to deny probation. *Id.* (conducting a *de novo* review because, when discussing whether to deny probation, "the [trial] court stated simply, 'the court finds that [a probationary sentence] would [depreciate the severity of the offense].'").

Here, in choosing to impose confinement, the trial court failed to explain its reasoning on the record for denying probation. It did not address any evidence, specific facts of the case, the presentence report, or the purposes and principles of sentencing. Therefore, we will perform a *de novo* review with no presumption of reasonableness. *State v. Cody Garris*, No. M2012-01263-CCA-R3-CD, 2013 WL 838673, at *7 (Tenn. Crim. App. Mar. 6, 2013) ("Because the trial court failed to make the appropriate considerations, our review is purely *de novo*.")

## B. Denial of Probation

Upon a *de novo* review of the record, we conclude that confinement was necessary to avoid depreciating the seriousness of the offense and because Defendant has a lack of potential for rehabilitation. Tenn. Code Ann. § 40-35-103(1)(B) (2020); *see State v. Nunley*, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999) (concluding that, while deterrence was not an appropriate factor upon which to impose a sentence of confinement, the defendant's lack of candor with the court was sufficient grounds for incarceration).

### *1. Nature and Circumstances of the Offense*

Defendant took advantage of his position as a Bridgestone employee to lure the victim behind a curtain with a false promise that that was the location where she would meet the performer. He then proceeded to violently rape her by forcefully holding her down, removing her clothes, and vaginally penetrating her. The victim "grab[bed] at"

Defendant and told him to "stop."  The victim testified to the devastating consequences of the attack and how it negatively impacted her life.

### 2. Defendant's Criminal Record

Defendant's criminal record as detailed in the presentence report includes two convictions for driving on a revoked or suspended license, one conviction for domestic violence, one conviction for theft, two convictions for violation of a restraining order, and one conviction for bail jumping.

### 3. Defendant's Background and Social History

Based on the psychosexual evaluation, Defendant claims he has had sexual intercourse with 700 to 800 women.  He has nine children with seven women, none of whom lived with him at the time of the offense.  Defendant is married and has no children with his current wife.  Defendant did not complete high school.  He is close with his family and has no documented problems with drugs or alcohol.  While Defendant has a relatively good history of employment, he has been "fired or quit a job at least once due to interpersonal problems with employer or co-workers."

### 4. Defendant's Present Mental and Physical Condition

Defendant has no documented physical or mental conditions.  Based on the psychosexual evaluation, Defendant "has displayed threatening, aggressive or violent behaviors in the community[,]" and his "threatening, aggressive or violent behaviors have been motivated by impulsivity, acting without thinking, and a lack of control or inhibitions."  Defendant "minimizes, denies, justifies, excuses, and blames others for behavior."

### 5. Deterrent Effect on Defendant

There is no evidence in the record concerning deterrence.

### 6. Best Interests of Defendant and the Public

We conclude that Defendant and the public would best be served by a sentence of confinement.  When Defendant was arrested, he lied about the rape, claiming that it was consensual sex and that the victim was "rubbing" and "kissing" him.  Defendant persisted in this fiction at trial, and his presentence report concluded that he "minimizes, denies, justifies, excuses[,] and blames others for his behavior."  With its verdict of guilty, the trial court implicitly accredited the testimony of the victim and discredited Defendant's

testimony. *See State v. Daniel O'Neil Connelly*, No. M2000-01914-CCA-R3-CD, 2001 WL 1356368, at \*2 (Tenn. Crim. App. Nov. 6, 2001) (stating that a guilty verdict in a bench trial "accredits the testimony of the witnesses for the [S]tate and resolves all conflicts in favor of the theory of the [S]tate"), *perm. app. denied* (Tenn. May 13, 2002). Defendant's failure to take responsibility for his actions reflects poorly on his potential for rehabilitation. *See Cody Garris*, 2013 WL 838673, at \*7 (finding that "the defendant's lack of candor and failure to accept responsibility . . . are both acceptable grounds" to deny probation); *see also State v. Souder,* 105 S.W .3d 602, 608 (Tenn. Crim. App. 2002) ("[L]ack of candor militates against the grant of probation.").

We conclude that the record supports the imposition of a sentence of confinement. Defendant is not entitled to relief.

## **Conclusion**

Based on the foregoing, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE